**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**WANDA BILLUPS,**

     **Plaintiff,**

**vs.**                        **CIVIL ACTION NO. 3:18-CV-00952**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered May 25, 2018 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 13), and Defendant's Brief in Support of Defendant's Decision. (ECF No. 14)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 13), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 14); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Wanda Billups (hereinafter referred to as "Claimant"), protectively filed her applications for Title II benefits and for Title XVI benefits in October 2014 alleging disability beginning May 10, 2010 (Tr. at 323-326, 327-332) due to "S/P heart attack, COPD, depression, anxiety d/o with panic attacks, chronic fatigue, migraines, sciatic nerve damage." (Tr. at 351)[1] Her claims were initially denied on February 10, 2015 (Tr. at 202-212, 213-223) and again upon reconsideration on May 22, 2015. (Tr. at 228-234, 235-241) Thereafter, Claimant filed a written request for hearing on June 30, 2015. (Tr. at 242-243)

An administrative hearing was held on April 27, 2017 before the Honorable Boyce Crocker, Administrative Law Judge ("ALJ"). (Tr. at 99-127) On May 18, 2017, the ALJ entered an unfavorable decision. (Tr. at 76-98) On June 2, 2017, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 319-322) The ALJ's decision became the final decision of the Commissioner on March 23, 2018 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On May 21, 2018, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) Defendant (hereinafter referred to as "the Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (ECF No. 13), and in response, the Commissioner filed a Brief in

---

[1] In her Disability Report – Appeal, at the initial level of review, Claimant alleged that she experienced "increased anxiety, depression, nausea, migraines, shortness of breath, and constipation." (Tr. at 394) She also suffered from "increased radiating back sciatica, joint, muscle, and all over pain." (Id.) Subsequently, at the reconsideration level, Claimant asserted in her Disability Report – Appeal that in addition to "increased anxiety, depression, and shortness of breath", she also had degenerative changes in her bones. (Tr. at 415)

Support of Defendant's Decision. (ECF No. 14) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was fifty-three years old as of the alleged onset date, and would be defined as a "person closely approaching advanced age", however, she changed age categories when she filed for disability benefits to a "person of advanced age" and was sixty years old at the time of the administrative hearing. See 20 C.F.R. §§ 404.1563(d)(e), 416.963(d)(e). (Tr. at 323, 327) Claimant has a high school diploma with four or more years of college; she previously worked as a caregiver and customer service representative. (Tr. at 352)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does,

the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2012. (Tr. at 81, Finding No. 1) The ALJ then determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since May 10, 2010, the alleged onset date. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: ischemic heart disease; chronic obstructive pulmonary disease (COPD); degenerative joint and disc disease; and headaches. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 85, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> except she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to unprotected heights and moving mechanical parts; should avoid concentrated exposure to humidity, extreme cold, and extreme heat, and pulmonary irritants such as dust, odors, and fumes.

(Tr. at 85-86, Finding No. 5)

At step four, the ALJ found that Claimant was capable of performing her past relevant work

6

of a combined job of order clerk at the sedentary level of exertion and semi-skilled in nature and complaint clerk sedentary and skilled. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

(Tr. at 91, Finding No. 6) The ALJ determined that Claimant had not been under a disability from May 10, 2010 through the date of the decision. (Tr. at 92, Finding No. 7)

## Claimant's Challenges to the Commissioner's Decision

Claimant asserts two main grounds of error. The first is that the ALJ did not comply with the Regulations and pertinent case law with respect to his evaluation of her symptoms and pain. (ECF No. 13 at 7-9) Specifically, Claimant argues that the ALJ improperly discredited her pain and other symptoms because she met the threshold obligation where the objective medical evidence that her impairments caused her subjective complaints and was therefore entitled to rely upon them in support of her claim that they prevented her from working at gainful activity level. (Id. at 10-12)

The second ground of error concerns the ALJ's failure to consider and evaluate Claimant's sister's third-party statement in accordance with the Regulations. (Id. at 12-13) The ALJ rejected this statement because she was not medically trained, however, this is not a requirement and the ALJ's rejection failed to comply with the Regulations. (Id. at 13-14) Claimant's sister, Clara Jean Markin, with whom Claimant resided, provided a third-party written statement on Claimant's behalf that corroborated Claimant's descriptions of her pain and resulting limitations, which the ALJ should have considered in his subjective symptoms analysis. (Id. at 14) The ALJ's failure to consider this third-party statement in accordance with the Regulations constitutes reversible error. (Id. at 15)

Claimant asks this Court to remand this matter in order to correct these errors. (Id.)

In response, the Commissioner asserts that the ALJ's evaluation of Claimant's subjective symptoms complied with the pertinent Regulations. (ECF No. 14 at 13) The ALJ found that Claimant's medical impairments could reasonably be expected to produce the alleged symptoms, but determined that they were not as intense, persistent or limiting as described by Claimant because in addition to the objective medical evidence of record, the ALJ also found that Claimant's daily activities were inconsistent with her alleged limitations. (Id. at 14-16) The ALJ carefully evaluated the entire record in assessing Claimant's subjective complaints about her limitations, and given the deferential standard of review, his findings should not be disturbed. (Id. at 17)

With respect to Claimant's sister's report, which was duplicative of Claimant's self-reports, the Commissioner states that the ALJ considered and evaluated same pursuant to the pertinent Regulations, noting that Ms. Markin's statement was based on her casual observations rather than objective medical examination and testing. (Id. at 18) The Commissioner disputes Claimant's contention that the ALJ discredited Ms. Markin's statement solely on her lack of medical training; he also found her statement inconsistent with the preponderance of the observations of the medical professionals in this case. (Id.)

The Commissioner contends that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 19)

## **The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

### Medical Evidence During the Relevant Period:

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Claimant presented to David Patick, M.D. in April 2010 with complaints of migraines, malaise and fatigue, and left-sided sciatica. (Tr. at 442) She also complained of increased stress due to caring for her 86-year-old mother who had Parkinson's disease and who had recently broken her leg. (Id.) Dr. Patick noted that Claimant had rare rhonchi, but her cardiovascular examination was negative. (Id.) Dr. Patick assessed Claimant with chronic left sided sciatica, history of depression, and history of migraines; asked her to get a wellness screening; refilled her medications; and advised her to follow up in one year. (Tr. at 442-443)

Claimant returned to Dr. Patick in April 2011 with unchanged complaints of left-sided sciatica and migraines, but she denied any cardiopulmonary symptoms. (Tr. at 444) Dr. Patick again assessed her with left sided sciatica, depression, and history of migraines and advised her to return in one year. (Tr. at 444)

Claimant saw Dr. Patick for her annual examination in April 2012, alleging "disabling left-sided sciatica." (Tr. at 448) Dr. Patick prescribed her 150 Lortab pills to be taken five times a day and one refill and referred her to a pain management clinic. (Tr. at 450-451)

Claimant presented to the emergency room in July 2012 with a headache after being in a hot environment without air conditioning for several days. (Tr. at 508) A physical examination showed that she had normal range of motion throughout, full strength, and no neurological deficits, and a CT scan of her head was negative. (Tr. at 510, 521) Physicians discharged Claimant the same day in stable condition. (Tr. at 513)

In October 2012, Claimant saw Suzy Tucker, a nurse at Ebenezer Medical Outreach, to establish care for management for chronic health issues. (Tr. at 459) Claimant reported that she had been prescribed Paxil for depression and had problems with left arm and shoulder pain,

constipation, migraines, gastrointestinal reflux disorder (GERD), and arthritis. (Id.) A physical examination was grossly normal and Ms. Tucker advised Claimant to stop smoking and engage in a healthy lifestyle. (Tr. at 460) During a follow up appointment in December 2012, Ms. Tucker started Claimant on Ultram for pain. (Tr. at 467)

In April 2013, Claimant saw Sandra Copley, M.D. of Ebenezer Medical Outreach, reporting that she had a tough few years being the primary care taker for her parents until they passed away. (Tr. at 469) Dr. Copley noted that Claimant had been prescribed a "huge dose" of Lortab pills from another provider that amounted to 200 pills a month, but Claimant stated that her pain doctor had gone out of business and she had not taken pain pills in eight months. (Id.) A physical examination was completely normal; Dr. Copley assessed her with GERD, osteoarthrosis, headache, fatigue, dental caries, NOS, and depression. (Tr. at 470) Dr. Copley instructed Claimant to see a dentist and "quitline info" and to follow up in three months. (Id.)

Claimant returned to Dr. Copley in January 2014 with ongoing complaints of joint pain, but her biggest complaint was a tooth abscess and interested in getting an appointment with a dentist. (Tr. at 473) A physical examination was unremarkable showing that Claimant was in no acute distress and had no increased work of breathing or signs of respiratory distress; normal heart rate and rhythm; normal gait and station, normal mood and affect; no clubbing or cyanosis in her extremities; and no neurological deficits. (Tr. at 475) Dr. Copley sent Claimant for comprehensive blood work, which was negative for lupus and rheumatoid arthritis. (Tr. at 495) At a follow up appointment in July 2014, Claimant reported that she was doing better since having some of her teeth extracted, but she wanted to continue taking Ultram for joint pain. (Id.) Claimant also complained of some chest discomfort. (Id.) Her physical examination was unchanged, but an EKG

showed an old lateral wall myocardial infarction. (Tr. at 497-498) In light of the EKG findings, Dr. Copley referred Claimant to a cardiologist. (Tr. at 498)

Claimant saw Ralph Stevens, M.D., in September 2014 for management of chest pain. (Tr. at 606) At that time, she complained of wheezing, mild bilateral wrist and hand pain, and neck and low back pain. (Id.) A physical examination revealed decreased breath sounds diffusely and crackles were present over both lung bases, but Claimant had normal gait and station, full range of motion, normal muscle strength and tone, and no neurological deficits. (Tr. at 609-610) A chest x-ray revealed both lungs were emphysematous but clear and her heart size was within normal limits. (Tr. at 501) Dr. Stevens assessed Claimant with atypical chest pain and referred her for a stress test, which revealed ischemia, but a normal ejection fraction at 67 percent. (Tr. at 603) Claimant returned to Dr. Stevens in October 2014 with unchanged complaints and physical examination. (Tr. at 619, 623) Dr. Stevens referred Claimant for a heart catheterization, which documented mild non-obstructive disease in the first diagonal; normal hemodynamics; and normal LV function. (Tr. at 613-614) During a repeat examination with Dr. Stevens in November 2014, Claimant denied any further chest pain and her physical examination remained unremarkable. (Tr. at 584) By December 2014, Claimant reported that she was doing well but she continued to smoke cigarettes. (Tr. at 626-629)

In April 2015, Claimant saw Adenrele Olajide, M.D. for a consultation regarding her allegations of pain in multiple joints over the past few years. (Tr. at 669) She reported that NSAIDs had been only marginally effective in relieving her symptoms. (Id.) The examination revealed tenderness to palpation of her back, left shoulder, and hands and Heberden's and Bouchard's nodes were noted. (Tr. at 671) Dr. Olajide assessed Claimant with osteoarthritis and inflammatory

arthritis, and referred her for imaging of her cervical spine, hands, and wrists. (Tr. at 672)

Shortly thereafter, x-rays of Claimant's cervical spine revealed osteophyte formation and bilateral foraminal stenosis at C5-6 and C6-7 as well as multilevel facet degeneration that was greater on the left. (Tr. at 674-675) X-rays of her wrists documented mild osteoarthritis changes about the bilateral first carpal metacarpal joints, greater on the left bones as they had a demineralized/osteoporotic appearance. (Tr. at 676-677) X-rays of the hands showed bilateral periarticular osteoporosis and soft tissue swelling in the region of the PIP joints of each hand.  (Tr. at 678-679) During a follow up appointment in August 2015, Dr. Olajide determined that Claimant had osteoarthritis, inflammatory arthritis. and vitamin D deficiency, and recommended medication management and physical therapy. (Tr. at 710, 715)

Thereafter, Claimant presented to Cabell Huntington Rehab Services with complaints of frequent headaches and pain in her shoulder and neck; however, she denied that this pain woke her up during the night. (Tr. at 726) She also complained of symptoms in her hands that flared when she would try to pick up her grandchildren. (Id.) She reported improvement after just one session (Tr. at 728); later treatment notes show that she did not continue with therapy on a consistent basis because of car issues. (Tr. at 730)

Claimant returned to Dr. Copley in November 2015, reporting that she was doing about the same with aches and pain and continued to smoke. (Tr. at 734) A physical examination showed that her lungs were clear and her gait and station normal. (Tr. at 737) Claimant saw Dr. Olajide the following month reporting that she felt better since starting the vitamin D therapy. (Tr. at 739) Dr. Olajide observed that Claimant did not appear uncomfortable and advised her to continue with physical therapy for her neck. (Tr. at 741)

Later in December 2015, Claimant returned to Dr. Stevens for follow up management of atherosclerosis, chest pain, coronary artery disease, coronary atherosclerosis, and hyperlipidemia. (Tr. at 745) Concerning her chest pain, Dr. Stevens noted that Claimant's symptoms were unchanged, though she reported that she had been exercising three times a week by walking. (Id.) A physical examination was unremarkable. (Tr. at 749-750)

Claimant saw Dr. Olajide on March 24, 2016 for follow up care of her vitamin D deficiency, osteoarthritis, and inflammatory arthritis. (Tr. at 802) On examination, Heberden's and Bouchard's nodes were seen, but Claimant did not appear uncomfortable. (Tr. at 804) Dr. Olajide instructed Claimant to continue to use an over-the-counter vitamin D supplement and follow up in three months. (Id.)

On June 27, 2016, Claimant saw Dr. Stevens for cardiology follow up. (Tr. at 832) She complained of mild chest pain, cough, and fatigue, but reported that she exercised by walking three time a week and continued to smoke cigarettes. (Id.) Dr. Stevens observed that Claimant had decreased breath sounds, but she had normal inspection of her joints and muscle with normal gait, range of motion, stability, and strength. (Tr. at 836) Dr. Stevens instructed Claimant to return in six months. (Tr. at 837)

Claimant reported no complaints during a repeat appointment with Dr. Copley the following month, although she stated that she was weary from living with so many family members and as a result, she wanted to get her own apartment. (Tr. at 795)

Claimant returned to Dr. Olajide in October 2016 reporting that her body pain had improved since she had stopped taking Pravastatin. (Tr. at 806) Heberden's and Bouchard's nodes were observed again, but Claimant did not appear uncomfortable. (Tr. at 808)

In November 2016, Dr. Copley advised Claimant that her recent blood work was very good overall. (Tr. at 816) Dr. Copley observed Claimant to have normal gait and station, no increased work of breathing or signs of respiratory distress, no neurological deficits, and normal mood and affect. (Tr. at 819) A repeat physical examination with Dr. Copley in December 2016 was unchanged. (Tr. at 814)

During a follow up cardiology appointment in January 2017, Dr. Stevens noted that Claimant's angina was under good control, coronary artery disease was stable, and hyperlipidemia was good. (Tr. at 830) Later that month, Claimant told Dr. Olajide that she no longer had aching pain since she had stopped taking the Pravastatin and had no other acute issues (Tr. at 846), however, she remained symptomatic with arthralgias in her upper and lower extremity joints and rated her pain as a "5." (Tr. at 847, 848)

Consultative Evaluation:

Claimant underwent a consultative examination with Stephen Nutter, M.D. in January 2015. (Tr. at 637-646) Claimant claimed disability due to chronic joint pain in multiple areas, fatigue, and history of a heart attack. (Tr. at 637) Dr. Nutter noted the medical records indicated a recent heart catheterization revealed non-obstructive coronary artery disease at 40 percent in the first diagonal branch. (Id.) A physical examination revealed regular heart rate and rhythm but her AP diameter was somewhat increased. (Tr. at 639) Claimant's breath sounds were also diminished, but no wheezes were present and she was not short of breath on exertion or when lying flat. (Id.)

On musculoskeletal examination, Claimant had tenderness in her left foot, both calves, shins, shoulders, hips, hands, wrists, elbows, and spine. (Tr. at 639-641) Claimant complained of pain with the range of motion testing of the lumbar spine and difficulty getting up from a supine

14

position due to back pain. (Tr. at 640) However, she had a normal gait; no muscle atrophy, no Heberden's or Bouchard's nodes in her hands; and negative straight leg raising test. (Tr. at 639-641) Dr. Nutter noted tenderness in the finger joints of the right hand, but not the left, and both hands revealed no redness, warmth or swelling and no atrophy. (Tr. at 640) Claimant could makes fists bilaterally and had normal strength with squeezing Dr. Nutter's fingers but decreased strength when squeezing the dynamometer. (Id.) Testing also showed that Claimant had 4/5 strength in the shoulder, 4/5 in the elbow, 3/5 in the wrist, and 3/5 in the hip, but Dr. Nutter noted that Claimant put forth submaximal voluntary effort. (Tr. at 640-641) In addition, pulmonary function testing revealed mild findings. (Tr. at 643-645) Dr. Nutter assessed Claimant with degenerative arthritis, chest pain, COPD, and chronic cervical and lumbosacral strain. (Tr. at 641)

State Agency Opinion Evidence:

On February 4, 2015, Caroline Williams, M.D. and Hedy Mountbatten-Windsor, M.D. concluded that Claimant could perform a reduced range of medium work requiring no more than frequent postural activities and no concentrated exposure to temperature extremes, humidity, pulmonary irritants, and work hazards. (Tr. at 142-144, 177-179) Although the ALJ found these opinions most persuasive, he recognized that additional evidence submitted after their review of the record supported a reduction in the exertional capacity to the light level and greater postural limitations. (Tr. 85-86, 91).

<u>Claimant's Function Report:</u>

On November 7, 2014, Claimant completed a Function Report. (Tr. at 374-381) Claimant stated that she lived in a house with her sister and remained capable of caring for her dog and grandchildren, though she is limited by feeling mentally drained, forgetful, tired, lacks desire and suffers from aches and pains. (Tr. 374-375) She also stated that she gets headaches 3-4 days a week as well as migraines 3-4 times per month, and experiences tremors, chest pain and is unable to sit or stand long and has trouble with concentration. (Tr. at 374) Claimant also reported that she could tend to her personal care, prepare simple meals, perform household chores, drive a car, shop in stores, pay bills, count change, manage a savings account, read, watch television, and spend time with family. (Tr. at 375-378) She stated that she does not go out of the house much because she is anxious around others. (Tr. at 379) She estimated that she could lift less than 20 pounds and can walk about 10 minutes before she needs to stop and rest and can pay attention for 30 minutes. (<u>Id</u>.) She stated she has trouble squatting, bending, climbing stairs, walking or standing or sitting for very long due to pain. (<u>Id</u>.) Claimant stated that she does not handle stress or changes in routine well. (Tr. at 380) She takes Motrin which gives her an upset stomach. (Tr. at 381)

<u>Clara Jean Markin Third Party Function Report:</u>

On November 24, 2014, Claimant's sister, Ms. Markin, completed a Third Party Function Report on Claimant's behalf. (Tr. at 382-390) Ms. Markin stated she had known Claimant for 57 years and spent 40 to 50 percent of the day with her watching television and talking. (Tr. at 382) Ms. Markin described Claimant to have weakness and pain in her limbs, muscle pain, headaches, and nervousness that affected her sleep and her ability to lift, carry, sit, stand, walk, reach, and perform postural activities. (Tr. at 383, 387-388) She indicated Claimant could care for her small

dog and make frozen dinners and sandwiches. (Tr. at 382-383, 384) Ms. Markin indicated that Claimant did not need reminders to take care of her personal needs or for grooming or taking her medication. (Tr. at 384) She explained Claimant could assist with light housekeeping, such as sweeping, laundry, and dishes, for approximately 15 minutes at a time, but then would need to stop and rest, although she did not need help or encouragement with these activities. (Id.)

Ms. Markin stated Claimant goes outside daily and gets around by walking, driving and riding in a car, and that Claimant can go out alone. (Tr. at 385) She stated that Claimant goes grocery shopping weekly about half an hour at a time and is capable of paying bills, counting change, handling a savings account and using a checkbook/money orders. (Id.)

Ms. Markin stated that Claimant's hobbies included reading, watching T.V. and using the computer "some" and that she does "fairly well" with these activities, although Claimant was able to do more before her illnesses/injuries/conditions began. (Tr. at 386) She stated that Claimant spends time with her family on a weekly basis and regularly goes to the store, library and family gatherings. (Id.) Claimant did not require reminders to go to places and did not require someone to accompany her. (Id.) Ms. Markin indicated Claimant has no problems getting along with others, although Claimant seemed to have become more depressed and withdrawn, had trouble concentrating and paying attention for long periods of time, did not handle stress well, and did not like change. (Tr. at 387-388)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified she lived with her sister in her sister's house, along with her great-aunt, her daughter, her daughter's husband, and four children. (Tr. at 103-104). She stated she graduated

from college with a degree in finance and also received vocational training for data processing. (Tr. at 104) She stated she previously worked as a customer service representative. (Tr. at 105-106)

Claimant stated her sleep was erratic, she went to bed late, and woke several times during the night. (Tr. at 107) She indicated it took her an hour or two to get her body moving in the morning due to stiffness. (Id.) She stated she took care of her dog, played with her grandchildren, such as coloring, and did the dishes and laundry, but did not do any outside work, and required breaks on bad days. (Tr. at 108, 112) She stated that she would shop for groceries, there was a store about five minutes from her house. (Tr. at 108) She stated her sister drove her to the hearing (Id.) She did not have any hobbies but watched DVD movies sometimes. (Tr. at 109) She stated she could take a shower and get dressed independently. (Id.)

Claimant testified she did not have medical insurance and had difficulties obtaining pain medication. (Tr. at 110) She confirmed she had not resorted to street or recreational drugs. (Id.) She described pain in her hands and wrists as well as essential tremors that resulted in her dropping and unable to pick up or grasp things. (Tr. at 111-114) She indicated she was right-handed, and her ability to write was affected by the shakiness. (Tr. at 111) She explained that the longer she writes, the worse the shakiness gets; she can only color with her grandchildren for about 10-15 minutes and then she needs to stop. (Tr. at 112) She has difficulty opening cans and jars because of the pain in her wrists and knuckles, although she can manage buttons, snaps, and zippers. (Tr. at 112-113)

She described stiffness in her neck with turning and problems with her emphysema if she performed too much activity. (Tr. at 114-115) Claimant stated she experienced daily fatigue and took an hour nap once a day. (Tr. at 115-116) She also has chest pains occasionally and headaches

two or three times a week that were sometimes migraines and sometimes "sick headaches" that made her nauseated. (Tr. at 116) She stated she was prescribed medication for the headaches, but if the migraines were severe, they may not subside for 12 to 18 hours. (Tr. at 117) She stated she had to lie down in a dark room, put ice on her head, and take the medication approximately twice a week. (Id.)

She described difficulties with being around others and memory and concentration due to anxiety and depression. (Tr. at 117-118) She must write down appointments and things of that nature or she will forget. (Tr. at 118)

Claimant stated she could stand for 30 to 45 minutes at a time and sit for hour at a time before needing to switch positions. (Tr. at 119) She explained that her legs and feet get numb from sitting with her feet on the floor. (Id.) She estimated she could lift 15 to 20 pounds if she "tried real hard," but picking up a gallon of milk with one hand was hard for her to do. (Tr. at 120)

<u>Gina Baldwin, Vocational Expert ("VE") Testimony:</u>

The VE described Claimant's past work as a combined job of order clerk (DOT #249.362-026) and complaint clerk (DOT #241.367-014) at the semiskilled and skilled sedentary levels, respectively. (Tr. at 122) The VE indicated Claimant performed this combination of jobs for three different employers. (Id.)

The ALJ asked the VE to consider a hypothetical individual with Claimant's vocational profile and controlling RFC. (Id.) The VE responded that the individual could perform Claimant's past relevant work as described by the *DOT*. (Id.) The VE stated an individual limited to occasional handling and fingering in the bilateral extremities or limited to no more than simple, routine tasks would be unable to perform Claimant's composite job. (Tr. at 123) The VE confirmed an

individual who was off task 15 percent or more during the workday could not maintain employment. (Tr. at 124)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As mentioned above, Claimant asserts that the ALJ failed to comply with the pertinent law with respect to his subjective symptom analysis where the evidence demonstrated that she did not have the capacity to function at any level of work for an eight-hour day or its equivalent on a continual basis.

Evaluation of Symptoms in Disability Claims:

Social Security Ruling ("SSR") 16-3p[3] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to

---

[3] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

After properly performing the two-step process, the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, and found that they "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 89)

The ALJ first considered the third-party function report provided by Claimant's sister. (Tr. at 89-90)[4] The ALJ then noted that the objective evidence of record[5] was inconsistent with Claimant's allegations of her symptoms: regarding her claims of having had musculoskeletal pain "for many years", the ALJ stated that the record "does not demonstrate strength deficits, circulatory compromise, neurological deficits, muscle spasms, fasciculations, fibrillations, or muscle atrophy or dystrophy, which as often associated with long-standing, severe or intense pain and physical inactivity." (Tr. at 90) The ALJ further noted that Claimant uses no assistive devices and that her neurological examination was normal. (Id.) In addition, the ALJ recognized that Claimant's musculoskeletal examinations revealed no swelling, effusion or deformities. (Id.)

The ALJ acknowledged Claimant's allegations that she is unable to work, and that she stopped working due to health concerns, however, he pointed out that Claimant told a provider in May 2010 that she was home taking care of her elderly mother who had Parkinson's disease, and further, when Claimant returned to the provider, she reported that she was thinking of returning to work since she no longer had to care for her mother, who had then passed. (Tr. at 90, 444)[6] The

---

[4] The undersigned addresses this further, *infra*.
[5] The ALJ discussed the relevant medical evidence of record, detailed *supra*, prior to his assessment of Claimant's statements concerning her symptoms and pain as they related to her impairments. (Tr. at 87-89)
[6] This record concerns the follow up visit with Dr. Patick on April 1, 2011.

ALJ also considered Claimant's more recent statements in her November 2014 Function Report that she spends her time watching television, reading, spending time with family, going to the library and post office, checking her computer and caring for her small dog. (Tr. at 90) It was also noted that Claimant told another provider in April 2013 that she had experienced a "tough few years" because she had been her parents' primary caretaker until they passed. (Tr. at 90, 469)[7]

The ALJ found that Claimant's "statements concerning her impairments and their impact on her ability to work inconsistent with her activities of daily living, the clinical findings, and course of treatment." (Tr. at 90) First, the ALJ determined that Dr. Patick's April 2012 opinion that Claimant had "disabling left sided sciatica" chronic pain was not entitled to controlling weight pursuant to 20 C.F.R. §§ 404.1527 [and 416.927] and SSR 96-5p, but gave it "little weight", finding the opinion was based upon Claimant's subjective complaints and inconsistent with the overall medical record. (Tr. at 90, 448) Next, the ALJ considered the January 2015 opinion evidence contained in the psychological consultative evaluation report by Emily Wilson, M.A. (Tr. at 90, 630-635) The ALJ found that Ms. Wilson observed Claimant's immediate and remote memories, ability to relate her history, concentration, persistence, pace and social functioning were all within normal limits, though her recent memory was moderately deficient. From this evidence, the ALJ determined that Claimant's mental health allegations are nonsevere and that the evaluator's assessment "is well reasoned and consistent with the medical evidence of record." (Tr. at 91) The ALJ gave Ms. Wilson's opinion great weight; the ALJ did not give as much credit to the opinions provided by the State agency medical consultants because additional evidence received since those opinions were rendered indicated that Claimant is more limited. (Id.)

---

[7] This concerned the follow up treatment note from Dr. Copley dated April 18, 2013.

Claimant points to the examination findings reported by Dr. Nutter as proof that her subjective symptoms were unduly discredited by the ALJ: Dr. Nutter confirmed Claimant had pain, tenderness and crepitus in her shoulders; tenderness in her right hand finger joints; diminished grip strength with the Dynamometer; pain and tenderness of the paraspinal muscles as well as the spinous processes of the cervical and lumbar spines with decreased range of motion; and reduced strength in both of her upper extremities. (ECF No. 13 at 10) The ALJ considered these findings at length, including Dr. Nutter's musculoskeletal exam which revealed that Claimant had tenderness in her left foot, both calves and shins, and a normal gait. (Tr. at 88) The ALJ acknowledged Claimant's complaints of pain in both shoulders and that Dr. Nutter noted crepitus during the exam, as well as tenderness in both hands, elbows, and wrists on palpation but not with range of motion. (Id.) The ALJ noted that Dr. Nutter's exam did not reveal atrophy or Heberden's or Bouchard's nodes in her hands "and her strength was normal with squeezing the examiner's fingers but decreased when squeezing the dynamometer." (Id.) The ALJ also considered Dr. Nutter's examination findings of Claimant's cervical spine as described *supra*, and that her lumbar spine revealed no muscle spasm but tenderness to light touch, normal straight leg raising, though Claimant had difficulty getting up from the supine position. (Id.) In addition, the ALJ noted that during testing, Claimant had mild tenderness in both hips, mild pain with range of motion in her right hip, but not the left. (Id.) The ALJ acknowledged Dr. Nutter's observation that Claimant had diminished strength: 4/5 strength in the shoulder and elbow and 3/5 in the wrist and hip, "however, she was noted to give submaximal voluntary effort." (Id.) Finally, the ALJ noted Dr. Nutter's assessment that Claimant had degenerative arthritis, chest pain, COPD, and chronic cervical and lumbosacral strain; her pulmonary function testing revealed mild findings. (Id.)

Indeed, the ALJ considered the opinion of Dr. Nutter (Tr. at 636-646), who also noted that Claimant "had a good memory for medical events" but she gave submaximal effort during his examination, though her strength was noted to be diminished. (Tr. at 91) Because the ALJ found that Dr. Nutter's opinion "is consistent with the relatively benign observations and findings during the evaluation", he gave it great weight. (Id.)

The ALJ also reviewed the medical records from Dr. Olajide which confirmed Claimant's allegations of multiple joint pain over several years, including his finding tenderness in her hands as well as Heberden's and Bouchard's nodes. (Tr. at 88) As discussed *supra*, the ALJ considered the x-ray evidence showing osteophyte formation and bilateral foraminal stenosis in her cervical spine, demineralization of her carpal metacarpal joints with the "overall impression was bilateral periarticular osteoporosis and soft tissue swelling in the region of the PIP joints of each hand." (Id.) The ALJ noted that Dr. Olajide assessed Claimant with osteoarthritis, inflammatory arthritis, and a vitamin D deficiency and recommended medication management and physical therapy. (Id.) It was noted that Claimant reported to Dr. Olajide in December 2015 that she "felt better since starting the vitamin D therapy" and that "she did not appear uncomfortable during the exam" and advised to "continue with physical therapy for her allegations of neck and back pain." (Tr. at 89, 738-743) The ALJ noted Dr. Stevens's treatment note wherein Claimant advised that she exercised three times a week by walking and that Dr. Stevens observed that her cholesterol and heart were stable on medications. (Tr. at 89, 745, 750) The ALJ noted that that Claimant reported to Dr. Olajide in October 2016 and January 2017 that her body pain had improved since she stopped taking Pravastatin. (Tr. at 89, 809, 846)

With respect to Claimant's headaches and migraines, the ALJ acknowledged her testimony and her responses to the pain questionnaire (Tr. at 368-373) wherein she alleges that she experiences several migraines a week that can last an entire day and even cause her nausea, making it necessary for her to lie down in a dark quiet room until they pass. (Tr. at 86) The ALJ noted that when Claimant presented to the emergency room in July 2012 for headaches, a CT test revealed no acute findings and that she was released in improved condition a short time later. (Tr. at 87, 511) It was also noted that Claimant took over-the-counter Tylenol for managing her migraines, in addition to her pain from arthritis, left arm and shoulder. (Id.) The ALJ discussed the records from Cabell Huntington Rehab Services: in addition to her complaints of pain from her shoulder and neck, Claimant complained of frequent headaches, although she denied "this pain awakened her during the night." (Tr. at 89) Although Claimant also "complained of symptoms in her hands that flared when she would try to pick up her grandchildren", after "a session" Claimant reported mild improvement, though she was not consistent with therapy due to car issues. (Tr. at 89, 730)

Elsewhere in his written decision, the ALJ explored "other evidence" that failed to support Claimant's allegations of her subjective pain and other symptoms that caused disabling limitations: she could perform simple household chores; prepare meals; pay bills; go to doctor's appointments; take medications; shop; drive; take care of personal needs as well as her pet. (Tr. at 84) The ALJ also considered Claimant's sister's third-party statement with respect to Claimant's functional limitations, finding that Ms. Markin's "statements do not establish that the claimant is disabled." (Tr. at 90)

Ultimately, the ALJ "acknowledged that the claimant has impairments, which cause limitations in her ability to perform work-related activities . . . [h]owever, the [ALJ] reject[ed] the

assertions to the extent the claimant alleges being totally precluded from work-related activities."
(Tr. at 91) In sum, given the conflicting evidence consisting of Claimant's allegations of pain and
other symptoms with the objective and other evidence of record, the ALJ is responsible for
resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether
the ALJ's finding is supported by substantial evidence and was reached based upon a correct
application of the relevant law. See, Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1995). The
undersigned **FINDS** the ALJ's discussion of the objective and other evidence of record in his
evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of her
symptoms, and that the ALJ's conclusion that Claimant's statements were inconsistent with the
evidence of record complied with the applicable law, and supported by substantial evidence.

Evaluating Opinion Evidence:

Claimant's next argument concerns the ALJ's consideration of her sister's third-party
statement. The Regulations addresses opinions from such sources thusly:

> Opinions from medical sources who are not acceptable medical sources and from
> ***nonmedical sources*** may reflect the source's judgment about some of the same
> issues addressed in medical opinions from acceptable medical sources. Although
> we will consider these opinions using the same factors as listed in paragraph (c)(1)
> through (c)(6) in this section, ***not every factor for weighing opinion evidence will
> apply in every case because the evaluation of an opinion from . . . a nonmedical
> source depends on the particular facts in each case.*** Depending on the particular
> facts in a case, and after applying the factors for weighing opinion evidence, an
> opinion . . . from a nonmedical source may outweigh the medical opinion of an
> acceptable medical source, including the medical opinion of a treating source. For
> example, it may be appropriate to give more weight to the opinion of a medical
> source who is not an acceptable medical source if he or she has seen the individual
> more often than the treating source, has provided better supporting evidence and a
> better explanation for the opinion, and the opinion is more consistent with the
> evidence as a whole.

20 C.F.R. §§ 404.1529(f)(1), 416.929(f)(1) (emphasis added). The Regulations further provide that an ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning[.]" Id. §§ 404.1529(f)(2), 416.929(f)(2).

In the written decision, the ALJ addressed Ms. Markin's third-party function report and specifically acknowledged that Ms. Markin is Claimant's sister and that they lived together. (Tr. at 89) The ALJ further acknowledged Ms. Markin's observations: that Claimant is only able to do light house cleaning for 15 minutes at a time before Claimant needs to stop and rest; that Claimant passes her time by watching television and reading; that Claimant has a lot of muscle pain, headaches, trouble concentrating, depression, nervousness; and that Claimant is unable to handle stress or changes in her routine. (Id.) As mentioned *supra*, the ALJ found that these statements did not establish that Claimant was disabled. (Tr. at 90) The ALJ noted further "[t]here is no indication that this individual is medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, and therefore the accuracy of their statements is questionable." (Id.) The ALJ then determined that "significant weight cannot be given to this third party statement because it, like the claimant's statements, is simply not consistent with the preponderance of the evidence." (Id.)

It is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1994). Here, the ALJ did not discredit Ms. Markin's third party statement solely on the basis that she is a nonmedical source, but more importantly, because he found that it was inconsistent with the evidence. The ALJ complied with the pertinent Regulations and controlling law, and was therefore entitled to give the weight he deemed appropriate to this third party statement. In short, the undersigned **FINDS** that the ALJ's evaluation of Ms. Markin's opinion was "rational" under the law, and further, that his evaluation was supported by substantial evidence.

The undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

### Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (ECF No. 13), **GRANT** the Commissioner's request to affirm the decision below (ECF No. 14), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections,

identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 1, 2018.

Omar J. Aboulhosn
United States Magistrate Judge